UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
STOREY CONSTRUCTION INC.,

               Plaintiff,                      08 Civ. 00976 (GBD)

-    against-

M&I MARBLE WORKS LTD., d/b/a           **AFFIDAVIT OF GARY STOREY**
MARBLE SOLUTIONS,                             **IN OPPOSITION TO**
                                                              **DEFENDANT'S MOTION TO**
               Defendant.                     **DISMISS**
-------------------------------------------------------X

STATE OF IDAHO      )
                            )   ss:
COUNTY OF BLAINE )

      GARY STOREY, being first duly sworn, upon oath deposes and says:

      1.    I am the owner and president of Storey Construction Co. Inc. ("Storey"). I am a resident of Blaine County, Idaho. I make the following statements based upon personal knowledge and belief, and am prepared to testify thereto.

      2.    Storey is a general contractor located in Ketchum, Idaho, and has worked over the last 20 years in several Western states. Storey has extensive experience building high-end custom residences. Storey's clients have included Governor Arnold Schwarzenegger and Maria Shriver, and Tom Hanks and Rita Wilson. Storey has purchased materials and supplies from many sources throughout the United States.

      3.    Storey is the general contractor on a residence located at 105 Georginia in Ketchum, owned by Miles and Jean Stanislaw.

4. In spring 2006 I was searching for stone flooring material for the residence. Prior to that time, the owners of the residence made me aware of Israel Cohen and his company, M&I Marble. I was furnished with preliminary design drawings for discrete portions of the residence prepared by Mr. Cohen, and I was told Mr. Cohen was an architect.

5. I contacted M&I before traveling to New York City. I specifically asked Mr. Cohen if M&I was willing and able to do business in Idaho. Mr. Cohen assured me that M&I was willing, able, and, in fact, eager to do business in Idaho.

6. As a result of Mr. Cohen's assurance and because Storey, and not the owners, was going to purchase the stone, I insisted on going to New York City. I wanted to meet the people at M&I Storey was going to be doing business with; I wanted to personally inspect M&I's products; I wanted to discuss terms and conditions with M&I; and I wanted to review Mr. Cohen's proposed design. I went to New York City on June 6, 2006.

7. I met with Mr. Cohen at M&I's showroom. The extensive variety, types, sizes, and colors of stone M&I had available for sale were discussed. M&I promised me that if I purchased Jerusalem stone flooring from M&I it could be delivered to Idaho in eight to ten weeks. I did not agree to purchase anything from M&I while in New York City.

8. While meeting with Mr. Cohen in New York City, the construction drawings/blueprints for the residence were reviewed by me and Mr. Cohen. The residence is approximately 6,000 square feet and is three stories high. Both from reviewing the drawings and from what I specifically told Mr. Cohen, he knew that the M&I Jerusalem stone being considered for purchase was the stone needed to construct the floors throughout the entire house on all three levels.

9. Both during my initial meeting with Mr. Cohen in New York City and in numerous subsequent conversations, I expressly stated to Mr. Cohen how critical timely delivery of the Jerusalem stone flooring was and that the consequences of late delivery of the stone flooring would be delay to the construction schedule and disruption or halting of other construction activities. On several occasions, Mr. Cohen responded that he was an architect, that he knew both the importance of timely delivery of stone flooring and the costly problems that late delivery of the stone would cause, and that delivery would occur within eight to ten weeks of the date when an order was placed.

10. After my visit to New York City, I personally made the following agreements with M&I:

a) On July 3, 2006, Storey and M&I agreed that if M&I could furnish 24 X 24 X ¾" stone flooring that was honed and chiseled and matched a color sample previously furnished by M&I and previously approved by me for color that Storey would likely purchase up to 6,000 square feet of Jerusalem stone for use in the Ketchum residence.

b) In August 2006, Storey and M&I agreed that M&I would ascertain whether M&I could obtain a sufficient quantity of Jerusalem stone of a type and color that matched a color sample approved by me and which would be cut to specified sizes in order to achieve a pattern that Mr. Cohen described and represented by a drawing he furnished to me to be "module C" pattern. The stone was to be quarried, not manufactured as stated in Mr. Cohen's affidavit. Because the stone needed to be quarried, I again requested and received assurance from Mr. Cohen that the stone would be delivered eight to ten weeks after Storey placed an order.

c)  In October 2006, Storey and M&I agreed that M&I would still sell stone flooring material to Storey even though Storey would not be purchasing from M&I most of the other stone materials I had previously discussed purchasing from M&I for use in vanities, back splashes, counters, etc.

d)  On October 23, 2006, Storey and M&I agreed for the first time to all of the essential contract terms for the quantity, size, type, cost, and delivery date of the Jerusalem stone flooring material. The terms of the agreement were consistent with Storey and M&I's prior agreements as to color, pattern, size, type, and eight- to ten-week week delivery schedule.

e)  On or about October 23, 2006, Storey and M&I agreed that because M&I insisted on being paid in full immediately and refused to extend any form of credit to Storey or accept a check from Storey and because Storey's credit card could not carry the full purchase price, Storey would pay M&I using Storey's clients' credit card.

f)  I am the one who independently negotiated, without instruction or direction from the owners, all the terms and conditions of Storey's contract with M&I. Jean Jensen Stanislaw is an interior designer, and she was involved in color and pattern selection, but she did not negotiate any contract terms. Miles Stanislaw was not involved at all in this process, except as an observer. All of the materials for the residence, e.g., lumber, windows, plumbing, fixtures, doors, granite, and marble counters and vanities, etc., were purchased by Storey, and not the owners.  (See Exhibit C attached hereto)

g)  After contracting, M&I proposed a revised delivery date of the material Storey purchased. M&I and Storey agreed that M&I's revised delayed delivery date was not acceptable. At that time, I again reminded Mr. Cohen of the impact that delayed delivery would have on the construction schedule. Nevertheless, M&I unilaterally changed its earlier promised

delivery date and promised to deliver by the revised date. I personally advised M&I on multiple occasions, both before and after placing the order on October 23, 2006, of the construction schedule requirements for stone flooring delivery. When the stone finally arrived, it was many weeks after the revised delivery date M&I unilaterally selected.

11. All of the dealings and negotiations I have just described were personally conducted by me. Storey was the purchaser of the stone flooring, and as the general contractor, I had full responsibility for negotiating the terms and conditions of the purchase order. In doing so, I acted independently and did not act pursuant to instruction or direction from the owners. Storey's dealings with M&I continued from May 2006 to April 2007. During that time, I personally had over 100 telephone calls and exchanged numerous e-mails and faxes with M&I. These communications were all for the purpose of negotiating the terms and conditions of the purchase order and attempting to obtain performance of those terms and conditions once the sales agreement between Storey and M&I was entered.

12. When the 6,000 square feet of Jerusalem stone flooring material finally arrived in Ketchum, there were three major things wrong: 1) the stone was the wrong size making it impossible to lay the stone furnished by M&I in the "module C" pattern, 2) more than 50 percent of the stone did not match any of the previously approved color samples, and 3) the surface of the stone contained unsightly particles not present in any of the previous samples.

13. The stone could not be inspected until it finally got to Idaho in April 2007 because it was shipped in palletized boxes and tightly packed in the boxes. There were approximately 30 pallets. After opening a number of the boxes, and after a skilled stone mason attempted unsuccessfully to lay the stone in a "module C" pattern, it became obvious the stone that was ordered by me and purchased by Storey was not the stone that was delivered by M&I.

14. Immediately after I became aware of M&I's nonconforming tender of goods, Storey notified M&I that the stone was "unusable" by letter dated April 10, 2007 (See Exhibit A attached hereto.)

15. Upon receipt of Storey's notification letter, Mr. Cohen told me that I was wrong and that a "module C" pattern could be achieved. Mr. Cohen volunteered to travel to Ketchum, Idaho at his own expense to show me how to achieve a "module C" pattern. Immediately after Mr. Cohen left Idaho, I formally rejected the stone by letter dated April 19, 2007. (See Exhibit B attached hereto.) The stone was rejected by Storey and not by the owners of the residence.

16. In April 2007, Mr. Cohen traveled to Idaho. While he was in Ketchum, Mr. Cohen and I inspected and discussed the stone. As a result, Mr. Cohen agreed with me and admitted the following:

   a. The stone was not cut to the proper or specified size to achieve the "module C" pattern.

   b. At least 50% of the stone flooring material did not come within an acceptable range of the previously agreed upon color sample.

   c. The stone flooring contained irregularities, flaws, and particles not seen in any of the prior samples furnished by M&I.

   d. M&I would use its best efforts to sell the rejected stone to local sources in Idaho.

   e. The only way that the wrong sized stone could be laid was by cutting it into different size pieces, and M&I would investigate resources to accomplish cutting the wrong sized stone.

17. After Mr. Cohen left Idaho, M&I never identified any potential local source to sell the stone or to cut the stone, and failed and refused to take any of the previously promised actions. A lawsuit followed. Since then I have attempted to sell the stone in order to mitigate Storey's damages. Except for a very small quantity, I have been unsuccessful.

18. Because none of the stone furnished by M&I was useable, an alternate source of Jerusalem Stone had to be located. This took time to investigate and research. An alternate supplier was located in New Jersey. 6,000 square feet of replacement stone was again purchased by Storey. Once again, there was a long lead time for obtaining and shipping the replacement stone. The replacement stone was delivered more than six months after the M&I stone should have arrived.

19. Because the stone flooring furnished by M&I was unusable, there was a delay of five to six months to the construction schedule. Several trades had to stop work altogether and leave the job to await delivery of the replacement stone. Other trades had to have their work re-sequenced, which disrupted the planned and logical sequence of construction.

20. I estimate the increased costs from the five- to six-month delay and the attendant disruption caused by M&I's failure to deliver stone when and as promised to exceed $100,000. Storey also incurred the following expenses in connection with the rejected stone purchased from M&I:

| | |
|---|---|
| 1. Customs Charges | $ 510.00 |
| 2. Trucking | 2,450.00 |
| 3. Time and Travel Expense to Port of Entry | 1,750.00 |

4. Move Stone From Residence to Bellevue, Idaho Storage Facility
    a) Labor      1,470.00
    b) Equipment      1,600.00

5. Labor to Locate and Secure Alternate Stone      <u>12,495.00</u>
          **TOTAL**     $20,275.00

The purchase price of the stone plus the additional costs total approximately $78,425. The total damages caused by M&I's breach of their agreement with Storey are in excess of $175,000.

DATED: March __24__, 2008      _____
                                                  Gary Storey

STATE OF IDAHO            )
                                   ) ss.
COUNTY OF BLAINE      )

On this __24__ day of March, 2008, before me, the undersigned, a Notary Public in and for the State of Idaho, duly commissioned and sworn, personally appeared Gary Storey, to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he signed and sealed the same as his voluntary act and deed for the uses and purposes therein mentioned.

WITNESS my hand and official seal hereto affixed the day and year first above written.

_____
[PRINTED NAME] __LAURI L. BURNS__
NOTARY PUBLIC in and for the state of Idaho, residing at __Fairfield__
My commission expires: __12/8/2009__

# STOREY CONSTRUCTION INC.

P.O. Box 1877, Ketchum, ID 83340 (208) 726-8816 FAX (208) 726-2180

M & l Construction, LTD
DBA Marble Solutions
735 11th Ave
New York, NY 10019

April 10, 2007

Attn: Sippe

Upon receiving the first 21 pallets of floor stone we have encountered two problems with regards to said stone.

    1.) Sizing

        The 24"X 24" tiles are 3/8" short of requested size. They measure 23 5/8" X 23 5/8" which renders them unusable in out grid (see illustration #1) without re-cutting the other tile sizes twice each.

    2.) White Spots

        Upon inspection many of the tiles have white spots in them that were not present on any of the samples. After going through the 21 pallets on site, 54% of the tiles were found to contain this undesirable trait.

Sincerely,

*[signature]*

Lonnie Lindquist

EXHIBIT A

**STOREY CONSTRUCTION INC.**

P.O. Box 1877, Ketchum, ID 83340  (208) 726-8816  FAX (208) 726-2180

April 19, 2007

Israel Cohen
M&I Marble Works, LTD
dba Marble Solutions
735 11th Avenue
New York, NY 10019
T: 212.969.9034
F: 212.969.9038

Re: Stanislaw/105 Georginia Road, Ketchum, Idaho

Dear Mr. Cohen:

    I am writing to put you on notice that Storey Construction, Inc. ("SCI") rejects the Jerusalem Stone flooring Marble Solutions provided for SCI's project at 105 Georginia Road, Ketchum, Idaho. The owners of the project are Miles and Jean Stanislaw.
    There are two insurmountable problems with the stone Marble Solutions provided. First, a significant quantity of the stone does not match the sample you provided and the Stanislaws approved. Second, the stone is cut in such a way that it can not be applied in a proper pattern without recutting the stone. SCI has discussed this second problem with two of its highly skilled stone and tile subcontractors who agree that the stone can not be installed as it has been cut.
    SCI stands ready to dispose of the stone at your direction. If you like, SCI will ship the stone to your designated location at your expense and upon your prior payment of the shipping costs. A second option would be for SCI to attempt to sell the stone locally in a commercially reasonable manner. The proceeds, if any, will be credited against SCI's damages arising from Marble Solutions non-conforming tender of stone. If we do not hear from you within seven business days, SCI will immediately pursue the second option.
    Whichever option you choose, you should be aware that Marble Solutions' failure to fulfill its supply obligations in a timely and satisfactory manner has caused significant delays to the Stanislaw project, and significant damages both to the Stanislaws and to SCI. SCI will attempt to obtain substituted goods from another supplier. The increased costs of the replacement tile and the increased costs of the serious delays to construction will be for the account of Marble Solutions.

Sincerely,

Gary Storey, President SCI



EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
STOREY CONSTRUCTION INC.,

               Plaintiff,                         08 Civ. 00976 (GBD)

-    against-

M&I MARBLE WORKS LTD., d/b/a               FRCP 17 RATIFICATION
MARBLE SOLUTIONS,

               Defendant.
-----------------------------------------------------X

      COMES NOW Jean Jensen Stanislaw and R. Miles Stanislaw pursuant to FRCP 17 and hereby ratify Storey Construction Inc. as plaintiff and the real party in interest in the above-captioned cause.

                      DATED this 21st day of March, 2008.

_____         _____
Jean Jensen Stanislaw                                  R. Miles Stanislaw

EXHIBIT C

## CERTIFICATION OF SERVICE

I hereby certify, under penalty of perjury, that on this 27th day of March, 2008, I caused a copy of Plaintiff's Affidavit and Memorandum of Law in Opposition to Defendant's Motion to Dismiss to be delivered, via first class mail, to the defendant's counsel of record, as follows:

> Michael J. Siris, Esq.
> Solomon and Siris, P.C.
> 50 Charles Lindbergh Blvd.
> Uniondale, New York 11553
> *Attorneys for Defendant*

_____
Patricia A. Vileno