UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
STOREY CONSTRUCTION INC.,

Plaintiff,

08 Civ. 00976 (GBD)

-against-

M&I MARBLE WORKS LTD., d/b/a MARBLE SOLUTIONS,

Defendant.
----------------------------------------------------X

**PLAINTIFF STOREY'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

## PRELIMINARY STATEMENT

Storey Construction Inc. ("Storey"), plaintiff, submits this memorandum in opposition to the defendant's motion to dismiss.

Storey purchased stone flooring material from Defendant M&I Marble Works Ltd. ("M&I"). M&I made a non-conforming tender of goods. Thereafter, M&I inspected the goods and admitted the goods were non-conforming. Storey promptly sent a letter of rejection. M&I did not take the remedial action M&I promised. Storey sued.

Storey first sued M&I in Idaho State Court. The case was dismissed for lack of personal jurisdiction. This motion is M&I's latest attempt to use a jurisdiction argument to avoid responding in damages for M&I's admitted breach of contract. Here, M&I contends that Storey does not have damages that exceed the $75,000 jurisdiction threshold.

M&I is wrong. Storey's damages exceed $175,000. Pursuant to UCC Section 2-711 (not Section 2-713 as stated by M&I), Storey's damages include (1) the cost of goods (UCC 2-711a and

712), (2) the costs incurred as a result of Storey's security interest in the rejected goods (2-711(3)), and (3) incidental and consequential damages (UCC 2-712(2)), which are defined in UCC 2-715.

Storey's itemized damages allowed by UCC 2-711, 2-712, and 2-715 are as follows:

| | | |
|---|---|---|
| -- | Cost of Goods | $ 58,150 |
| -- | Cost due to 5- to 6-month construction delay caused by M&I's breach of contract | $100,000+ |
| -- | Cost of shipping, inspecting, moving, customs, storing, and protecting | $ 20,275 |
| | | $178,425 |

## I. M&I HAS TOTALLY FAILED TO SHOW "TO A LEGAL CERTAINITY" THE $75,000 THRESHOLD HAS NOT BEEN MET.

The burden of a defendant in a Motion to Dismiss once a plaintiff has alleged damages in excess of $75,000 was recently addressed by the Second Circuit.

> "A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a *'reasonable probability'* that the claim is in excess of the statutory jurisdictional amount." *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (quoting *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir. 1975)). This burden is hardly onerous, however, for we recognize "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999).
>
> **To overcome the face-of-the-complaint presumption, the party opposing jurisdiction must show *"to a legal certainty"* that the amount recoverable does not meet the jurisdictional threshold.** *Id.* (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-289, 82 L. Ed. 845, 58 S. Ct. 586 (1938)). Our cases have set a high bar for overcoming this presumption. **"[T]he legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim."** *Chase Manhattan Bank, N.A. v. Am. Nat. Bank and Trust Co. of Chicago*, 93 F.3d 1064, 1070-71 (2d Cir. 1996) (quoting *Tongkook*, 14 F.3d at 785). "**[E]ven where [the] allegations**

> **leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted.**" *Zacharia v. Harbor Island Spa, Inc.*, 684 .2d 199, 202 (2d Cir. 1982); see also *Tongkook*, 14 F.3d at 785 ("Where the damages sought are uncertain, the doubt should be resolved in favor of the plaintiff's pleadings.") (Emphasis added.)[1]

Against, this standard, M&I's motion falls far short.

## II. ISSUES FOR DETERMINATION

1) Has M&I shown "to a legal certainty" that Storey's damages do not exceed the jurisdiction threshold of $75,000?

2) Are delay damages, which are a consequence of a seller tendering non-conforming goods, recoverable and, therefore, includable in determining whether the $75,000 threshold has been reached? (Even if Storey's delay damages are not included, Storey's damages as verified by Gary Storey's affidavit exceed $75,000.00.)

### 1. M&I Breached the Contract with Storey by Tendering Non-Conforming Goods.

Storey is a general contractor based in Ketchum, Idaho. Storey has had over 20 years experience building high-end custom residences. Storey's clients include Governor Arnold Schwarzenegger and Maria Shriver and Tom Hanks and Rita Wilson.[2]

Storey is the general contractor on a residence located at 105 Georginia in Ketchum, owned by Miles and Jean Stanislaw.[3]

Storey contacted Mr. Cohen and was assured that M&I was willing and able to do business in

---

[1] *Scherer v. Equitable Life Assur. Soc'y of the United States*, 347 F.3d 394, 397 (2d Cir. 2003).
[2] See Affidavit of Gary Storey in Opposition to Defendant's Motion to Dismiss ("Aff. of Gary Storey"), page 1, ¶ 2.
[3] See Aff. of Gary Storey, page 1, ¶ 3.

Idaho.[4]

As a result of Mr. Cohen's assurance and because Storey, and not the owners, was going to purchase the stone, Mr. Storey insisted on going to New York City. Mr. Storey wanted to meet the people at M&I Storey was going to be doing business with; he wanted to personally inspect M&I's products; he wanted to discuss terms and conditions with M&I; and he wanted to review Mr. Cohen's proposed design suggestions. Mr. Storey went to New York City on June 6, 2006.[5]

Mr. Storey met with Mr. Cohen at M&I's showroom. The extensive variety, types, sizes, and colors of stone M&I had available for sale were discussed. M&I promised Mr. Storey that if he purchased Jerusalem stone flooring from M&I it could be delivered to Idaho in eight to ten weeks. Mr. Storey did not agree to purchase anything from M&I while in New York City.[6]

While meeting with Mr. Cohen in New York City, the construction drawings/blueprints for the residence were reviewed by Mr. Storey and Mr. Cohen. The residence is approximately 6,000 square feet and is three stories high. Both from reviewing the drawings and from what Mr. Storey specifically told Mr. Cohen, Mr. Cohen knew that the M&I Jerusalem stone being considered for purchase was the stone needed to construct the floors throughout the entire house on all three levels.[7]

Both during Mr. Storey's initial meeting with Mr. Cohen in New York City and in numerous subsequent conversations, Mr. Storey expressly stated to Mr. Cohen how critical timely delivery of the Jerusalem stone flooring was and that the consequences of late delivery of the stone flooring would be delay to the construction schedule and disruption or halting of other construction activities. On several

[4] See Aff. of Gary Storey, page 2, ¶ 5.
[5] See Aff. of Gary Storey, page 2, ¶ 6.
[6] See Aff. of Gary Storey, page 2, ¶ 7.

occasions, Mr. Cohen responded that he was an architect, that he knew both the importance of timely delivery of stone flooring and the costly problems that late delivery of the stone would cause, and that delivery would occur within eight to ten weeks of the date when an order was placed.[8]

After Mr. Storey's visit to New York, he personally made the following agreements with M&I:

a) On July 3, 2006, Storey and M&I agreed that if M&I could furnish 24 X 24 X ¾" Jerusalem stone flooring that was honed and chiseled and matched a color sample previously furnished by M&I and previously approved by Mr. Storey for color that Storey would likely purchase up to 6,000 square feet of Jerusalem stone for use in the Ketchum residence.[9]

b) In August 2006, Storey and M&I agreed that M&I would ascertain whether M&I could obtain a sufficient quantity of Jerusalem stone of a type and color that matched a color sample approved by Mr. Storey and which would be cut to specified sizes in order to achieve a pattern that Mr. Cohen described and represented by a drawing he furnished to Mr. Storey to be "module C" pattern. The stone was to be quarried, not manufactured as stated in Mr. Cohen's affidavit. Because of the need to quarry the stone, Storey again requested and received assurance from Mr. Cohen that the stone would be delivered eight to ten weeks after Storey placed an order.[10]

c) In October 2006, Storey and M&I agreed that M&I would still sell stone flooring material to Storey even though Storey would not be purchasing from M&I most of the other stone materials for use in vanities, back splashes, counters, etc., that Mr. Storey had previously discussed purchasing from M&I.[11]

d) On October 23, 2006, Storey and M&I agreed for the first time to all of the

---

[7] See Aff. of Gary Storey, page 2, ¶ 8.
[8] See Aff. of Gary Storey, page 3, ¶ 9.
[9] See Aff. of Gary Storey, page 3, ¶ 10 a).

essential contract terms for the quantity, size, type, cost, and delivery date of the Jerusalem stone flooring material. The terms of the agreement were consistent with Storey and M&I's prior agreements as to color, pattern, size, type, and eight- to ten-week delivery schedule.[12]

e) On or about October 23, 2006, Storey and M&I agreed that because M&I insisted on being paid in full immediately and refused to extend any form of credit to Storey or accept a check from Storey and because Storey's credit card could not carry the full purchase price, Mr. Storey would pay M&I using Storey's clients' credit card.[13]

Mr. Storey independently negotiated, without instruction or direction from the owners, all the terms and conditions of Storey's contract with M&I. Jean Jensen Stanislaw is an interior designer, and she was involved in color and pattern selection, but she did not negotiate any contract terms. Miles Stanislaw was not involved at all in this process, except as an observer. All of the other materials for the residence, e.g., lumber, windows, plumbing, fixtures, doors, granite, and marble counters and vanities, etc., were purchased by Storey, and not the owners.[14]

After contracting, M&I proposed a revised delivery date for the material Storey purchased. M&I and Storey agreed that M&I's delayed delivery date was not acceptable. At this time, Mr. Storey again reminded Mr. Cohen of the impact that delayed delivery would have on the construction schedule. Nevertheless, M&I unilaterally changed its earlier promised delivery date and promised to deliver by the revised date.[15]

Mr. Storey personally advised M&I on multiple occasions, both before and after placing the

---

[10] See Aff. of Gary Storey, page 3, ¶ 10 b).
[11] See Aff. of Gary Storey, page 4, ¶ 10 c).
[12] See Aff. of Gary Storey, page 4, ¶ 10 d).
[13] See Aff. of Gary Storey, page 4, ¶ 10 e).
[14] See Aff. of Gary Storey, page 4, ¶ 10 f).
[15] See Aff. of Gary Storey, pages 4 and 5, ¶ 10 g).

order on October 23, 2006, of the construction schedule requirements for stone flooring delivery and the adverse financial effects that delayed delivery would have on that schedule. When the stone finally arrived, it was many weeks after the revised delivery date M&I unilaterally selected.[16]

All of the dealings and negotiations just described were personally conducted by Mr. Storey. Storey was the purchaser of the stone flooring, and as the general contractor, Mr. Storey had full responsibility for negotiating the terms and conditions of the purchase order.[17]

Storey's dealings with M&I continued from May 2006 to April 2007. During that time, Mr. Storey personally had over 100 telephone calls and exchanged numerous e-mails and faxes with M&I. These communications were all for the purpose of negotiating the terms and conditions of the purchase order and attempting to obtain performance of those terms and conditions once the sales agreement between Storey and M&I was entered.[18]

When the 6,000 square feet of Jerusalem stone flooring material finally arrived in Ketchum, there were three major things wrong: 1) the stone was the wrong size making it impossible to lay the stone furnished by M&I in the "module C" pattern, 2) more than 50 percent of the stone did not match any of the previously approved color samples, and 3) the surface of the stone contained unsightly particles not present in any of the previous samples.[19]

The stone could not be inspected until it finally got to Idaho in April 2007 because it was shipped in palletized boxes and tightly packed in the boxes. There were approximately 30 pallets. After opening a number of the boxes, and after a skilled stone mason attempted unsuccessfully to lay the stone in a "module C" pattern, it became obvious the stone purchased by Storey was not the stone

---

[16] See Aff. of Gary Storey, pages 4 and 5, ¶ 10 g).
[17] See Aff. of Gary Storey, page 5, ¶ 11.
[18] See Aff. of Gary Storey, page 5, ¶ 11.

that was delivered by M&I.[20]

Immediately after Mr. Storey became aware of M&I's non-conforming tender of goods, Storey notified M&I that the stone was "unusable" by letter dated April 10, 2007. (See Exhibit A attached hereto.)[21]

Upon receipt of Storey's notification letter, Mr. Cohen told Mr. Storey that he was wrong and that a "module C" pattern could be achieved. Mr. Cohen volunteered to travel to Ketchum, Idaho, at his own expense to show Mr. Storey how to achieve a "module C" pattern. Immediately after Mr. Cohen left Idaho, Mr. Storey formally rejected the stone by letter dated April 19, 2007. (See Exhibit B attached hereto.) The stone was rejected by Storey and not by the owners of the residence.[22]

While he was in Ketchum, Mr. Cohen and Mr. Storey inspected and discussed the stone. As a result, Mr. Cohen agreed with Mr. Storey and admitted the following:

a. The stone was not cut to the proper or specified size to achieve the "module C" pattern.[23]

b. At least 50% of the stone flooring material did not come within an acceptable range of the previously agreed upon color sample.[24]

c. The stone flooring contained irregularities, flaws, and particles not seen in any of the prior samples furnished by M&I.[25]

d. M&I would use its best efforts to sell the rejected stone to local sources in

---

[19] See Aff. of Gary Storey, page 5, ¶ 12.
[20] See Aff. of Gary Storey, page 5, ¶ 13.
[21] See Aff. of Gary Storey, page 6, ¶ 14.
[22] See Aff. of Gary Storey, page 6, ¶ 15.
[23] See Aff. of Gary Storey, page 6, ¶ 16 a).
[24] See Aff. of Gary Storey, page 6, ¶ 16 b).

Idaho.[26]

e. The only way that the wrong sized stone could be laid was by cutting it into different size pieces, and M&I would investigate resources to accomplish cutting the wrong sized stone. [27]

After Mr. Cohen left Idaho, M&I never identified any potential local source to sell the stone or to cut the stone, and failed and refused to take any of the previously promised actions and a lawsuit followed. Since then Mr. Storey has attempted to sell the stone in order to mitigate Storey's damages.[28]

Because none of the stone furnished by M&I was useable, an alternate source of Jerusalem Stone had to be located. This took time to investigate and research. An alternate supplier was located in New Jersey. 6,000 square feet of replacement stone was purchased by Storey. Once again, there was a long lead time for obtaining and shipping the replacement stone. The replacement stone was delivered more than six months after the M&I stone should have arrived.[29]

Because the stone flooring furnished by M&I was unusable, there was a delay of five to six months to the construction schedule. Several trades had to stop work altogether and leave the job to await delivery of the replacement stone. Other trades had to have their work re-sequenced, which disrupted the planned and logical sequence of construction.[30]

Mr. Storey estimates the increased costs of the five- to six-month delay and the attendant disruption caused by M&I's failure to deliver stone when and as promised exceed $100,000. In

---

[25] See Aff. of Gary Storey, page 6, ¶ 16 c).
[26] See Aff. of Gary Storey, page 6, ¶ 16 d).
[27] See Aff. of Gary Storey, page 6, ¶ 16 e).
[28] See Aff. of Gary Storey, page 7, ¶ 17.
[29] See Aff. of Gary Storey, page 7, ¶ 18.
[30] See Aff. of Gary Storey, page 7, ¶ 19.

addition, Storey also spent $20,275 in excess of the purchase price for delivering, moving, shipping, inspecting, storing, clearing customs, and protecting the M&I stone. The M&I stone cost $58,150. The total damages caused by M&I's breach of their agreement with Storey are in excess of $175,000.[31]

## III. LEGAL ARGUMENT

### 1. UCC Remedies are to be Liberally Administered.

UCC I-305 states:

> **Remedies to be liberally administered.**
> (a) The remedies provided by the uniform commercial code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed. . . .

### 2. Storey's First Element of Damage is the $58,150 Paid to M&I to Purchase the Goods

M&I tendered non-conforming goods to Storey. Storey timely rejected the non-conforming goods which amounted to the full 6,000 square feet of stone purchased by Storey. Storey is entitled to recover the price paid to M&I. UCC 2-711[32] states:

> **Buyer's remedies in general – Buyer's security interest in rejected goods.**
> (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (section 28-2-612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid. (Emphasis added.)

[31] See Aff. of Gary Storey, pages 7 and 8, ¶ 20.
[32] Defendant's memorandum incorrectly cites UCC 2-713 for the proper measure of damages. UCC 2-713 applies in the case of "non-delivery or repudiation by the seller." That is not this case.

The price paid to M&I for the non-conforming goods was $58,150.

### 3. The Second Element of Storey's Damages is the $20,275 to Inspect, Transport, Store, Protect, Move, and Other Related Charges.

After Storey rejected the non-conforming goods, Storey promptly purchased 6,000 square feet of Jerusalem stone flooring material from a different supplier. This is a case of a rejection of non-conforming goods, so UCC 2-712 applies. UCC 2-712 states:

> **"Cover" – Buyer's procurement of substitute goods.**
> (1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
>
> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 28-2-715), but less expenses saved in consequence of the seller's breach. (Emphasis added.)

Storey's cost to "cover" – purchase price for replacement goods – was slightly less than the price paid to M&I. By obtaining replacement goods at a slightly lower price than charged by M&I, M&I has avoided being charged any increased costs for replacement goods.[33]

But Pursuant to UCC 2-712, M&I is liable for the incidental damages incurred by Storey. "Incidental damages" are defined in UCC 2-715(1) as follows:

> **Buyer's incidental and consequential damages.**
> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expenses incident to the delay or other breach.

[33] M&I's memorandum (page 2) references UCC 2-713. That reference is wrong. UCC 2-713 applies to damages for a seller's non-delivery or repudiation. Circumstances not present here.

Storey's "incidental damages" computed in accordance with UCC 2-715(1) are $20,275.

**4. The Third Element of Storey's Damages is the $100,000 Delay Costs Caused by M&I's Delayed Delivery and Subsequent Non-Conforming Tender.**

Storey and M&I agreed the stone flooring would be delivered 8 to 10 weeks after the date of purchase. The purchase date was October 23, 2006. The stone should have arrived before January 5, 2007. The stone flooring did not arrive until April 2007.

When the stone flooring did arrive, it was not what Storey ordered and Storey rejected the stone. Storey then sought and obtained Jerusalem stone flooring from a different supplier. This substituted stone arrived in July 2007.[34] Storey should have had the stone promised by M&I in January 2007. Storey obtained suitable stone six months later than promised and agreed by M&I.

The 6,000 square feet of stone flooring covered almost the entire three floors of the residence. Laying the stone was a critical item of work. Numerous follow-on trades were dependent on the laying of the stone floor in order to proceed with their work. Some of the trades had to pull off the job altogether. Other trades had to have their work re-sequenced and performed in an illogical sequence. The overall construction schedule was delayed five to six months.

M&I was fully aware of the effect on the construction schedule and the financial consequences of delay if Storey failed to obtain timely delivery of the stone. When Mr. Storey and Mr. Cohen first met in July 2006, a set of blueprints was reviewed. Mr. Cohen is an architect. The blueprints showed a 6,000 square foot house with stone flooring material covering all of the floors. In that first meeting, Mr. Cohen promised delivery of the stone eight to ten weeks after purchase. Mr. Storey explained

[34] The 6,000 square feet of substituted stone purchased at a lower price than M&I's price and delivered was laid in the residence, without incident, problem or complaint

how critical timely receipt of the stone was to the construction schedule. Mr. Cohen affirmed that he was an architect, understood the effect of the stone on the construction schedule, acknowledged that other trades' work was dependent on the installation of the stone, and knows there were financial consequences of delay.

Prior to October 23, 2006, the date of contracting, and in subsequent conversations, Storey continued to stress and insist on timely delivery of the stone. M&I continued to assure Storey the stone would be delivered on time.

As a consequence of M&I failing to timely deliver stone that conformed to the parties' agreement, the construction schedule was delayed five to six months and the costs increased. These increased costs caused by delay are classic textbook consequential damages caused by M&I's breach of contract and are recoverable.

UCC 2-715(2) states:

> (2) Consequential damages resulting from the seller's breach include
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;

UCC 2-712 entitles Storey to consequential damages as defined in UCC 2-715.

On October 23, 2006, the date of contracting, M&I knew and expressly admitted that timely receipt of the 6,000 square feet of stone flooring material was critical to the construction schedule, that construction would be delayed if delivery was delayed, and that cost would increase.

A Second Circuit case contains an almost identical fact pattern. In *McNally Wellman Company v. New York State Electric and Gas Corporation,* 63 F3d 1188, (2d Cir. 1995), NYSEG hired McNally to supply six spillway gates for a dam being constructed. The gates arrived late. The

Second Circuit found:

> The parties had every reason to anticipate that the subcontractor actually manufacturing the gates could cause a delay in their delivery, and thus chose to define any damages that resulted from such a delay as incidental or consequential in paragraph 360. This definition, moreover, is consistent with the UCC's definition of incidental and consequential damages. See N.Y. U.C.C. § 2-715(1)

Even if Storey's delay damages are not considered consequential, Storey's delay damages also fit the definition of incidental damages. UCC 2-715(1) states:

> **Buyer's Incidental and Consequential Damage.**
> Incidental damages resulting from the seller's breach include . . . reasonable expenses incident to the delay or other breach.

Regardless of how classified, M&I is liable for Storey's delay damages.

Storey has estimated that the delay damage caused by M&I's breach of contract exceeds $100,000.

### 5. <u>Storey's Complaint Complies With FRCP 9(G).</u>

Paragraph 7 of Storey's Complaint states:

> M&I was made aware that the stone was intended for use in a custom residence in Idaho and that a delay in delivery of the stone would cause a delay in the construction process which would cause financial loss.

Paragraph 8 of Storey's Complaint states:

> M&I breached the agreement with SCI [Storey] by *inter alia* delivering the stone late.

It is hard to imagine how more clear Storey's Complaint could have been in giving M&I notice of a claim for consequential damages. Should the Court disagree, we respectfully submit that leave to amend, and not dismissal, would be the proper remedy.

**6. <u>Storey is the Real Party in Interest</u>.**

The Affidavit of Gary Storey clearly demonstrates Storey is the real party in interest. Storey independently negotiated, without instruction or direction from the owners, terms and conditions of the contract. Storey had extensive communication with M&I by phone, fax and e-mail. Storey took delivery of the stone, arranged for transportation of the stone, inspected the stone, rejected the stone, and attempted to sell the stone. Storey purchased all the other materials used in the house. The only thing Storey did not do was directly pay for the stone, and as explained by Gary Storey, only because M&I would not take a check, or extend Storey credit.

The FRCP 17 Ratification requested by M&I's memorandum is provided herewith. M&I acknowledges in its memorandum that the real party in interest issue is moot upon the providing of the Ratification.

## CONCLUSION

Storey's damages caused by M&I's breach of contract are well in excess of $75,000. Accordingly, we respectfully submit that defendant's motion should be denied in its entirety, and this case should proceed as this Court has jurisdiction.

Dated: March 26, 2008

Respectfully Submitted,

McDonough Marcus Cohn Tretter
Heller & Kanca, LLP

By: ______________________
Diane K. Kanca (DK7196)

Attorneys for Plaintiff
Storey Construction Co. Inc.
145 Huguenot Street
New Rochelle, New York 10801
( 914) 632-4700
Fax (914) 632-3329
DianeKanca@aol.com
DKKanca@MMCTHK.COM

## CERTIFICATION OF SERVICE

I hereby certify, under penalty of perjury, that on this 27th day of March, 2008, I caused a copy of Plaintiff's Affidavit and Memorandum of Law in Opposition to Defendant's Motion to Dismiss to be delivered, via first class mail, to the defendant's counsel of record, as follows:

Michael J. Siris, Esq.
Solomon and Siris, P.C.
50 Charles Lindbergh Blvd.
Uniondale, New York 11553
*Attorneys for Defendant*

Patricia A. Vileno